UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IRVING A. BACKMAN,

    Plaintiff

V.

RAMZAY GROUP OF COMPANIES,

    Defendant

MAGISTRATE JUDGE ___JLA___

04 - 12488 WGY

CIVIL ACTION NO.

RECEIPT # _____
AMOUNT $ ___'50 ἐ(____
SUMMONS ISSUED___1_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK.___ ᐺΡ._____
DATE_____ 11/24/04_____

## COMPLAINT

### Nature of Action

1. This is an action for monetary damages arising out of the Defendant's breaches of contractual obligations to the Plaintiff.

### Parties

2. The Plaintiff, Irving A. Backman, ("Backman"), is an individual residing in Newton, Middlesex County, Massachusetts.

3. The Defendant, Ramzay Group of Companies ("Ramzay"), is a duly organized legal entity having a principal place of business in Moscow, Russia.

### Jurisdiction and Venue

4. This Court has jurisdiction over this matter pursuant to the provisions of 28 USC §1332 as there is diversity of citizenship and an amount in controversy in excess of $75,000.

5. This Court has personal jurisdiction over Ramzay pursuant to the provisions of Mass G.L. c. 223A, §3, as Ramzay has transacted business within the Commonwealth of Massachusetts at all times relevant hereto.

6. Venue is appropriate before this Court as the Plaintiff resides in the Commonwealth of Massachusetts.

<u>Underlying Facts</u>

7. At all times relevant hereto, Backman has been in the business of assisting scientists and entrepreneurs in helping them develop and market technology.

8. In the year 2000, Backman was approached by a partnership known as the "Phoenix Group" to provide funding for a start-up company engaged in the development of "Glow Discharge Plasma Technology" in exchange for certain marketing rights and equity.

9. On or about September 20, 2000, Backman and members of the Phoenix Group, Edward Levin, Olexandr Zayika and Vasily Bakhar entered into an agreement (the "2000 Agreement"), a true and authentic copy which is appended hereto as Exhibit 1.

10. As a result of the 2000 Agreement Water Works Global, Inc. ("WWG"), was incorporated in Delaware in October 2000 for the purpose of developing and marketing the Glow Discharge Plasma technology.

11. Pursuant to the 2000 Agreement, Backman provided funding to WWG in the amount of $200,000.

12. In the latter part of 2002, Ramzay expressed interest in acquiring a portion of Backman's marketing rights and equity in WWG.

13. Following discussions and negotiations between the parties, on or about December 10, 2002, Backman and Ramzay entered into a "Memorandum of Understanding and Agreement" (the "2002 Agreement"), a true and authentic copy which is appended hereto as Exhibit 2, pursuant to which Ramzay agreed to undertake the following obligations:

(a) to pay Backman the sum of $185,000 in exchange for a portion of his marketing and equity rights, with $75,000 to be paid on or before December 23, 2002, an additional $25,000 on or before February 15, 2003, and an additional $85,000 within six weeks after successful completion of the demonstration test;

(b) to finance acquisition of demonstration equipment by WWG and help organize demonstration tests up to a limit of $100,000 of expenses;

(c) to provide loans of up to $2,000,000 over a period of two years for a new entity, ABS Systems, Inc. ("ABS"), to market the technology; and

(d) to pay Backman a $1,500 monthly consulting fee upon the successful completion of demonstration tests, for a seven-year period thereafter.

14. The 2002 Agreement was amended on two occasions in 2003, which amendments are collectively appended hereto as Exhibit 3.

15. Although Ramzay paid a total of $100,000 to Backman under the 2002 Agreement, it was late in its payment of installments. Notwithstanding the fact that Ramzay confirmed in writing on June 16, 2003 (*see* Exhibit 4 hereto) that the demonstration tests had been satisfactorily performed, Ramzay breached its obligation to pay the remaining $85,000 due to Backman.

16. Ramzay further breached the 2002 Agreement by paying only $53,510 of the $100,000 to be paid for demonstration expenses.

17. Further, Ramzay breached the 2002 Agreement by failing to fulfill its commitment to make $2,000,000 available for the financing of ABS.

18. In further breach of its obligations under the 2002 Agreement, Ramzay failed to pay Backman the $1,500 monthly consulting fee.

19. In the summer of 2003, Ramzay repudiated the 2002 Agreement by suggesting in communications to Backman that the 2002 Agreement no longer was in full force and effect, without having any basis therefor.

20. At all times relevant hereto, Backman has fully and timely complied with his obligations under the 2002 Agreement.

21. As a direct and approximate result of Ramzay's breaches of obligations, Backman has incurred monetary damages, including the following:

(a) the $85,000 installment due under the 2002 Agreement;

(b) reimbursement for payment of demonstration expenses;

(c) expectation damages arising out of the failure of Ramzay to fund ABS;

(d) the $1,500 monthly consulting fees due and owing for the seven-year term.

Count I:  Action for Breach of Contract

22. Paragraphs 1-21 are incorporated herein and made a part hereof.

23. By virtue of the foregoing, Ramzay is liable to Backman for breach of contract for all damages sustained as a direct and proximate result thereof, together with interest, costs and attorneys' fees.

4

<u>Prayer for Relief</u>

WHEREFORE, Backman respectfully requests that this Court enter judgment in his favor against Ramzay in the amount of all damages sustained as a direct and proximate result of Ramzay's breaches of the 2002 Agreement, together with interest, costs and attorneys' fees.

Respectfully Submitted,

IRVING A. BACKMAN,
By His Attorneys,

Lawrence G. Green, BBO #209060
Thomas T. Reith, BBO #648671
PERKINS SMITH & COHEN LLP
One Beacon St., 30th Floor
Boston, MA 02108-3106
617-854-4000

10221-13

Copy

EXHIBIT 1

# An Agreement

This agreement is between Irving A. Backman of Newton, Massachusetts, USA (hereinafter referred to as "IB"); Edward Levin of the Hague, Netherlands, Vasily Bakhar of Moscow, Russia and Alexander Zayika of Dnepropetrovsk, Ukraine; all three of which will be hereafter referred to as "THE PHOENIX GROUP".

A. Background Information:

THE PHOENIX GROUP has represented to IB that it has developed certain advanced technology (hereinafter referred to as "THE TECHNOLOGY") over the past 10 - 12 years, utilizing a Low Temperature Plasma – (LTP) to purify contaminated water from both organic and inorganic bodies.

THE PHOENIX GROUP claims it has several Russian Patents issued on this breakthrough technology, but it has also developed improvements, which it believes, can now be patented in the U.S., and internationally thereafter.

THE PHOENIX GROUP further claims that their system will be efficient, cost effective and competitive. THE PHOENIX GROUP states that it is aware of and has read articles on the "GLOW DISCHARGE PLASMA SYSTEM" funded by the U.S. Department of Energy which is being developed by the Pacific Northwest National Laboratory (PNNL) in Richland, Washington, also utilizing a LTP to separate contaminants from a body of water or waste stream. THE PHOENIX GROUP claims the "GLOW DISCHARGE PLASMA" utilizes similar concepts or technology, but it cannot perform as well as "THE TECHNOLOGY" developed by THE PHOENIX GROUP and any patents applied for and issued to THE PHOENIX GROUP on their technology will not infringe on the "GLOW DISCHARGE PLASMA SYSTEM", or any patents issued for it, or any other patents.

B.    Purpose of Agreement:

THE PHOENIX GROUP requires financing to patent its improved technology in the U.S. and internationally and it also requires financing to build several working models of its system for demonstration in the U.S. (or elsewhere). A budget of $200,000 U.S. has been prepared by THE PHOENIX GROUP to accomplish this goal and IB has been approached by THE PHOENIX GROUP to provide the financing under the following conditions which has been agreed upon by both IB and THE PHOENIX GROUP:

1.    IB will fund the full $200,000 in monthly stages according to the budget to be approved by IB. Funding by IB will include direct funding from IB, or one of his related Family Trusts, or from contracts, grants, or investments by other sources. Further, funding will consist of a minimum of 50% equity and 50% in some form of debt instrument for a minimum of 3 years and an interest rate not in excess of 2% above the prime rate. To finance patent work and demo units construction, IB will provide the maximum of $200,000. Should additional funding be required to complete the above tasks, The Phoenix Group will be responsible to source these additional funds.

However, the budget for the first month will be limited to $10,000 which will be utilized by THE PHOENIX GROUP to complete a patent search on its intended patents and prepare a write-up or summary for IB of the various patents it intends to file. IB will use this description to engage a U.S. Patent Attorney for the required filings. THE PHOENIX GROUP will then prepare each required patent in Russian, translate it into English, and then forward it to IB or his selected law firm, to file for patent approval. Once a Patent Attorney is selected by IB, then monthly funding will start and THE PHOENIX GROUP will also commence building approximately 2 – 3 different demonstration models for demonstration in the US under the supervision of the Phoenix Group.

After IB has funded $20,000 or more for THE PHOENIX GROUP and in the event IB is not satisfied with the results, performance, or the progress of THE PHOENIX GROUP, IB will have the option, at his sole discretion, to discontinue further funding of THE PHOENIX GROUP. In such event, IB could forfeit certain equity shares or royalties outlined in Paragraph 3 and 5 below.

2.    THE PHOENIX GROUP represents these demonstration models should be ready in 5 to 6 months for demonstration use in the US after the start of full scale funding. It is contemplated the small model will be able to clean up about 120 gallons of contaminated water per hour, and the second, a larger demonstration model should be able to clean up about 5,280 gallons per hour.

3.    Within 30 days of the signing of this Agreement THE PHOENIX GROUP will form an U.S. Corporation to fulfill the intents of this Agreement. "THE TECHNOLOGY" and all patents related to "THE TECHNOLOGY" will be assigned to the new corporation which will be named THE PHOENIX CORP., or any other name selected by THE PHOENIX GROUP. (Later references to THE PHOENIX CORP. or THE PHOENIX GROUP are the same.)

Equity in the Phoenix Corporation will be divided as follows:

25% to Edward Levin, 25% to Vasily Bakhar, 25% to Alexander Zayika, and 15% to IB. However, the shares held by IB could be forfeited if IB does not complete certain funding requirements as outlined below:

When IB provides $150,000 or more of funding, he will retain his entire 15% share of equity; when $125,000 of funding is provided, IB will retain 11% equity; when 100,000 of funding is provided, IB will retain 8% share of equity; when 50,000, of funding is provided, IB will retain 6% share of equity; when 20,000 of funding is provided, IB will retain 3% share of equity. If under $20,000 of funding is provided, IB will retain 0% of equity.

If, after the above funding is completed, it is decided that further financing is required and IB is instrumental, directly or indirectly in assisting with obtaining $750,000 or more, he will be provided with an additional 8% of equity, (providing he has completed his prior financing obligations.) If IB is instrumental in obtaining an additional $500,000 to the total of $1,250,000, he will be provided with additional 2 % of equity, for the total of 25% ownership of the Phoenix Corporation.

4.    Progress Reports:

THE PHOENIX GROUP will send IB a written report at least every 2 weeks, summarizing the progress during the past 2 weeks, what is expected to be accomplished in the next 2 weeks, as well as any other information that reflects on long-term goals or budget requirements. Once monthly, a summary of expenditures and budget projections should also be furnished along with the budget request for the following month.

5.    Royalties to IB:

After the funding of $60,000 by IB, IB will be entitled to receive 2% royalties on all future PHOENIX CORP. sales. After the funding of $125,000 by IB, the royalty to IB will be increased to 4%.
If after funding of $200,000 by IB and he later is directly or indirectly instrumental in obtaining an additional $750,000 or more of funding to THE PHOENIX GROUP, he will receive an additional 1% royalty payment.

6.    18 Month Option to IB to Market the Technology:

IB will have the exclusive rights in certain territories to market the
Phoenix products and Technology related to water purification and the
separation or extraction of precious metals for the next 25 years, provided
he has completed funding of $150,000 or more to THE PHOENIX
GROUP.    These territories include all of North America (including
Mexico), plus Peru and Columbia in South America, if IB chooses to
establish a new corporation or entity for that purpose (hereinafter referred
to as New-Corp. for the purpose of this Memo).
IB, or any Investor Group selected by him will have 60% ownership of
New-Corp. and 40% will be owned by THE PHOENIX CORP.  In order
for New-Corp. To retain its exclusive rights to the above technology or
products, and after 18 months after start-up, it will have to generate
at least $150,000 in fees, royalties or dividends to THE PHOENIX
CORP. during the next 12 month period; $200,000 after the next 12
months and thereafter a minimum of $250,000 per year.  If such income
is not generated for THE PHOENIX CORP., the rights to exclusivity will
be lost, but not the marketing rights.  Any equipment or products
manufactured by THE PHOENIX CORP. and sold to New-Corp. will be
sold at a price of 25 % lower than the most preferential price but no more
then 50% over the actual costs.

7.    Collateral:

All equipment, prototypes, working models, designs and data related to
the technology (but not patents) held or owned by THE PHOENIX
GROUP or the Phoenix Corp. will be assigned to IB as collateral for his
funding, loans or investments. The amounts, owed to IB will be treated as
a corporate debt and will be repaid to IB before any dividends could be
issued.
After IB has recovered 125% of his investments or funding, such
collateral will be released.  IB will have the option at any time to assign
all or part of his interests or royalties to any family member, family trust,
or other entity.

8.    Support to IB of Sales and Contracts:

The Phoenix Corp will use its best efforts to provide to IB products,
service, training and other needs he might require to successfully
operate and grow New-Corp.

9.    It is agreed by IB and the Phoenix Group that if and when a decision is made to bring in additional funding or partners, the equity participation in the Phoenix Corp held by all concerned will be reduced proportionately.

This Agreement, dated September 20, 2000 is a Massachusetts Agreement   and is subject to and enforceable in the Massachusetts Courts  and a telefax transmission of this Agreement shall be legal and binding upon all parties that are part of this Agreement.

AGREED TO BY:

_____          _____
Edward Levin                      Alexander Zayika

_____          _____
Vasily Bakhar                     Irving A. Backman

A8302000

# Memorandum of Understanding and Agreement
Between
## Irving A. Backman of Newton Massachusetts, USA
And
## RAMZAY Group of Companies of Moscow, Russian Federation,

### Dated December 10, 2002

1. Background Information. Irving Backman (Backman) has certain contractual marketing and other rights, assigned to him by Water Works Global, Incorporated (WWGI) of Voorburg, The Netherlands, formerly known as The Phoenix Group or the Phoenix Corporation. These contractual rights relates to certain technologies, developed by (multiple worldwide patents pending) WWGI, and described as technologies for "water purification and the separation or extraction of precious metals". This technology has also been referred to as "Glow Discharge Plasma Technology" as well as "Torch Technology". These rights, assigned to Backman are fully described in an Agreement dated September 20, 2000, signed by Edward Levin, Olexandr Zayika, Vasily Bakhar and Irving Backman, which is attached hereto and made part of this Agreement. Likewise, WWGI has approved the formation of ABS Systems, Inc. (ABS) as the corporate entity that will own all the rights, previously assigned to Backman under par. 6 of the Agreement of September 20, 2000. Under the Agreement, Backman will own 60% of ABS, and WWGI will own 40%. Backman also represents that, according to the Agreement, Backman will own 60% of the marketing rights, assigned to him and WWGI will own 40%. Backman also certifies that he completed the funding of $200,000 to the WWGI, as required under p.1 and p.2 of the Agreement. Backman also owns 15% of stock of WWGI.

2. RAMZAY Group of companies (RAMZAY) is interested in acquiring Backman's marketing rights, equity in WWGI and certain other rights under the above mentioned Agreement with WWGI, and the following terms have been agreed upon for this transaction:

A. This Agreement will become effective upon the payment of $75,000 to Backman by RAMZAY, which is to be paid prior to December 23, 2002

B. Upon execution of this Agreement, RAMZAY will immediately finance acquisition of demonstration equipment from WWGI and will help organize Demonstration tests at ECS in Massachusetts and several possible locations in Florida. The budget for these demonstration tests and the tests program itself will be discussed and agreed upon by both RAMZAY and Backman. RAMZAY undertakes to fully finance these demonstrations, up to the limit of $100,000.





C. RAMZAY will assume obligation to provide ABS (company, into which marketing rights described above will be assigned into upon incorporation. RAMZAY may decide to select another name for the company, with Backman's agreement) with loans of up to $2,000,000 over the period of two years to guaranty business success. These loans will be at rate of libor plus 2 or at the US Prime Rate, whichever is less, and will be available after the successful demonstration of the technology.

D. On February 15, 2003, RAMZAY will pay Backman additional $25,000, if it looks as if the test program, scheduled for the spring of y2003 will not be delayed. Prior to February 15th, 2003, parties to this agreement will undertake to agree on the program of the Demonstration tests and method of determining what constitutes "successful or unsuccessful" tests. The demonstrations tests are expected to be carried out in the spring of y2003; once it is determined that the tests are successful, RAMZAY will then pay Backman $85,000 within 6 weeks after successful completion of the Demonstration tests, plus the prior amount $25,000 if not paid previously. In consideration of this total payment of $185,000, Backman will transfer 50% of his 60% interest (30%) his marketing rights to RAMZAY, or an affiliated · company, selected by RAMZAY. Simultaneously, Backman will also transfer all of his voting rights of his remaining 30% of marketing rights to RAMZAY, so that RAMZAY will then vote its 60% to incorporate ABS and to elect officers and directors. Should RAMZAY decide not to purchase remaining Backman's interests at an end of an option, described in E. below, the voting rights for the interests not purchased from Backman or ABS, will revert back to Backman.

E. Until the next option date, which will be 9 months after the successful demonstration tests in Massachusetts and/or Florida are completed, but no later then 15 months from the signing of this agreement, RAMZAY will have an option to purchase the remaining 30% of Backman's marketing rights, still owned by Backman, or his 30% interest in ABS for the purchase price of $200,000. If and when this option is exercised, RAMZAY will then own a total of 60% of marketing rights (or ABS Systems), and Backman will own 0%.

F. If RAMZAY decides not to exercise the above option (described in E), RAMZAY will then continue own its 30% in ABS Systems, and Backman will own his 30%, and each will have voting rights to their shares of stock. However, RAMZAY will then be required to place $75,000 in escrow to satisfy the following situation: should ABS Systems be unsuccessful in its business affairs, and not able to pay the first royalty or fee payment to WWGI of $150,000 at the end of the first 12 months period as described in an Agreement between Backman and WWGI of September 20, 2000 p.6., and it is then decided by Backman or ABS to continue with business and not to lose exclusive marketing rights, the said above $75,000 will constitute RAMZAY's obligation. ABS Systems will then retain its exclusive marketing rights for an additional 12 months period by making payment of $150,000 to WWGI.

G. RAMZAY will also have an option to purchase Backman's 15% equity interest in WWGI, according to the following schedule:



1). Option 1 – Option to purchase 1/3 of Backman's 15% interest (or 5%) in WWGI within 1 year from the date of signing of this agreement for the price of $125,000

2). Option 2 – Option to purchase remaining 10% equity interest in WWGI within 2 years from the date of signing of this agreement for the purchase price of $400,000

It should be noted that under the September 20, 2000 Agreement, under Par. 9, Backman's equity interests may proportionately be diluted together with other Shareholders equity interest in WWGI.    In such an event, the above option will only be applicable to Backman's diluted equity interests.

H. During any of the option periods, including option period to purchase marketing rights or equity, Backman will be prohibited from selling, or offering for sale, or otherwise issue rights or shares, described in this agreement. In case of an untimely demise of Mr. Backman, his estate will assume the same obligations toward RAMZAY, and RAMZAY will have the same obligations to the Estate of I. Backman as if Backman was alive. In the event any of the RAMZAY's options are not exercised by RAMZAY within the option period, Backman will have full option rights will revert back to Backman without any restriction.

I. It is possible that Backman may acquire an additional 8% to 10% equity interest in WWGI under paragraph 3 of the September 20, 2000 Agreement through the investments or funding of J. Dorfman or Teklink or their affiliates. So, if Backman does acquire this additional stock interest, RAMZAY will have an option to purchase, within two years from the date of this agreement, 8% interest for the purchase price of $320,000, or 10% interest for the purchase price of $400,000. Other then the above situation, RAMZAY will stand in place of Backman (RAMZAY will be entitled to whatever rights Backman has for additional stock under p. 3 of the Agreement of September 20, 2002)

J. According to the Agreement between Backman and WWGI, Backman will own rights to a certain royalty payments, described as 4% royalty on all WWGI sales. RAMZAY will have an option to purchase this royalty rights from Backman by paying him $1,000,000 for 50% of the royalty rights (2%) or $2,000,000 for 100% of the royalty rights (4%). This option can be exercised within a 2 year period after the signing of this Agreement.

K. 30 days after the successful completion of the demonstration tests in Massachusetts and/or Florida, ABS will start paying a consulting fee of $1,500 per month to Backman for the period of up to 7 years, provided he is available for reasonable consultations at his offices or by telephone. In the event his health or other unforeseen events, including disability or death, prevent him from providing such consulting services, the above fee of $1,500 monthly shall be paid by ABS for a total period of 5 years.

3. In the event questions arise as to the length or any extension of the demonstration tests and additional costs, or any other subject mater, I. Backman and RAMZAY will strive to

resolve such questions among themselves, each relying on the good faith dealings of the other.

4. This Agreement, dated December 10, 2002 is a Massachusetts Agreement, and is subject to and enforceable in the courts of Massachusetts and a telefax transmission of this Agreement shall be legal and binding upon all parties that are part of this Agreement. All references to dollars in this Agreement refer to US dollars.

Agreed to by:

The RAMZAY Group of Companies

Ilya Gordeev, President

Irving A. Backman

# An AMENDMENT # 1
## To
# Memorandum of Understanding and Agreement
### Between
### Irving A. Backman of Newton Massachusetts, USA
### And
### RAMZAY Group of Companies of Moscow, Russian Federation,

### Dated December 10, 2002

1. Parties to the above named Agreement have agreed that in the event RAMZAY does not exercise the option, outlined in Paragraph E of the above Agreement of December 10, 2002, by the payment of $200,000, I. Backman will have the option within 24 months after the date of the above agreement, to repurchase RAMZAY's entire interest in ABS by payment to RAMZAY, or their designee, of $185,000 (provided such amount has already been paid to I Backman, or the lesser amount if less than $185,000 has been paid to I. Backman by RAMZAY) within 10 days of notice, and RAMZAY will then return or give up any or all interest in ABS, or the marketing rights of I. Backman to the Water Works Global Technology, and the above Dec. 10, 2002 agreement will thus be canceled. In such an event, all other investments and/or payments by RAMZAY into ABS or for demonstration tests prior to the expiration of the option, outlined in Paragraph E of the above Agreement, will be forfeited.

2. The parties to the above named Agreement have agreed to extend the date of the Agreement activation (last date, on which the first contractual payment to I. Backman should be made) to January 10th, 2003. Both parties have also agreed that the first payment will be in the amount of $100,000, instead of $75,000, as called for in the Agreement.

Confidential                                                                     Page 1 of 2

3. In the event that RAMZAY has failed to take steps, as outlined in Paragraph B of the above Agreement during the first 30 day period of activation, I Backman may, in his sole discretion cancel the Agreement of Dec.10, 2002, on or before Feb. 10, 2003, and refund to RAMZAY their first payment of $100,000 to I. Backman, provided that such payment has been received by I. Backman.

Agreed to by:

The RAMZAY Group of Companies

3. 01. 2003

Ilya Gofdeev, President

Irving A. Backman

NOV-15-2004 13:32 FROM:T.A. KMAN Case 1:04-cv-12488-WGY Document 1-4 Filed 11/24/2004 617 9898056 TO:18178544046 Page 3 of 3 P.8

FROM : TD'RAMZAY' PHONE NO. : 276 2371 Mar. 25 2003 03:57PM P2

АССОЦИАЦИЯ ПРОИЗВОДИТЕЛЕЙ И ПРОДАВЦОВ МОРОЖЕНОГО "СТОЛИЧНОЕ МОРОЖЕНОЕ"

## "КОМПАНИЯ РАМЗАЙ"

109029, г. Москва, Михайловский пр-д, 3, тел. (095) 276-55-11, 276-18-91, 276-35-68, факс (095) 276-23-71
E-mail:ramzay@ramzay.ru

На _____ от _____

### An Amendment # 2
### To
### Memorandum of Understanding and Agreement
### Between
### Irving A. Beckman of Newton Merchants USA
### And
### RAMZAY Group of Companies of Moscow, Russian
### Federation, dated December 19, 2002

March 25, 2003

1. Parties to the above named Agreement have agreed that so long as RAMZAY completes payment of $100,000 to Beckman (of which $40,000 has already been paid) on or about March 28th, 2003, and also makes next payment of the approved Demonstration tests Budget (Budget of Jan. 5, 2002) on or about the same date of March 28th, 2003, then the above mentioned Memorandum of Understanding and Agreement, together with an Amendment # 1 to the above Agreement will remain in full force

2. Parties have also agreed that so long as the conditions of the above paragraph are met and because of the delays in the beginning of the US Demonstrations tests, to extend the activation date of the Memorandum of Understanding and Agreement of December 10, 2002 (date from which certain time periods, options etc. take count) to January 15th, 2003

Agreed to by:

The RAMZAY Group of Companies

_____
Vasiliy Koshevoy, Vice President

Irving A. Beckman

_____



# RAMZAY GROUP OF COMPANIES
# MICHAYLOVSKIY PROYEZD 3
# MOSCOW, RUSSIAN FEDERATION

IRVING A. BACKMAN AND ASSOCIATES
35 WENDELL ROAD
NEWTON, MA 02459 USA

**June 6, 2003**

Dear Irving,

This letter is to be viewed as confirmation that RAMZAY GROUP OF COMPANIES has reviewed all currently available information on the results of demonstration tests, performed in AGAWAM, MA in April 2003 by Water Works Global, Inc, and find them satisfactory. Thus, RAMZAY is prepared to complete next milestone of our Agreement of December 10th, 2002 by paying you $85,000 within next 6 weeks. Kindly arrange for Water Works Global's consent to transfer agreed upon marketing rights, being acquired by RAMZAY into TECHWATER, INC at your earliest convenience, so that we can complete the above wire transfer.

Thank you very much,

Vasily Koshevoy,
VP Finances, RAMZAY

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Irving A. Backman

## DEFENDANTS

Ramzay Group of Companies

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  __Middlesex__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Moscow, Russia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Lawrence G. Green (BBO# 209060)
Thomas T. Reith (BBO# 648671)
Perkins Smith & Cohen LLP, One Beacon St.,
Boston, MA 02108  617-854-4000

ATTORNEYS (IF KNOWN)

# 04-12488 WGY

## II. BASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | ☐ 370 Other Fraud | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 371 Truth in Lending | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | Property Damage | | | 12 USC 3410 |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability | Product Liability | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus | | | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc | ☐ 871 IRS — Third Party | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is an action for monetary damages arising out of the Defendant's breach of contractual obligations to the Plaintiff.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $85,000 plus other damages more fully set forth in the Complaint

CHECK YES only if demanded in complaint
**JURY DEMAND:** ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY  (See instructions):

N/A

JUDGE _____    DOCKET NUMBER _____

DATE  11/24/04

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) Irving A. Backman v. Ramzay Group of Companies

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

___    I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

___    II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       for patent, trademark or copyright cases

X      III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
___            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

___    IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,    04 - 12488 WGY
               690, 810, 861-865, 870, 871, 875, 900.

___    V.      150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

        N/A

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?

                                                        YES          NO

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST?   (SEE 28 USC §2403)

                                                        YES          NO

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?

                                                        YES          NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?

                                                        YES          NO

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).

                                                YES          NO    N/A

        A.     IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

               EASTERN DIVISION        CENTRAL DIVISION           WESTERN DIVISION

        B.     IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

               EASTERN DIVISION        CENTRAL DIVISION           WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Thomas T. Reith
ADDRESS Perkins Smith & Cohen LLP, One Beacon Street, Boston, MA 02108
TELEPHONE NO. 617-854-4000

(Cover sheet local.wpd - 11/27/00)